# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| VIAD CORP d/b/a Exhibit/Giltspur, A Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO.: 08-CV-6706 |
| ANNE HOUGHTON, | ) ) | District Judge Robert M. Dow, Jr. |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

On November 21, 2008, Plaintiff Viad Corp ("Viad") filed a one-count complaint alleging that Defendant Anne Houghton breached a provision contained within Viad's Management Incentive Plan when she left Viad's employment and took a job with a competitor. Both parties have moved for summary judgment [26, 38]. For the following reasons, the Court grants Plaintiff Viad's motion for summary judgment [26] and denies Defendant Houghton's motion [38].

**I.   Background**

On July 21, 1997, Plaintiff Viad Corp, a Delaware corporation, hired Defendant Anne Houghton, an Illinois resident, as a senior designer. Prior to her employment with Viad, Houghton had worked for more than ten years as a designer in the exhibit and events portion of the Exposition industry. Viad, through its three business segments, provides services primarily to major domestic and international corporations, and specifically to exhibition organizers and exhibitors. Viad's three business segments include (i) GES Exposition Services, Inc., (ii) Exhibitgroup, and (iii) travel and recreation services. Houghton was hired by Exhibitgroup,

whose business ranges from servicing exhibitors at a trade show (or entities that have a private function in relation to a trade show) to providing design services for private corporate functions.

Exhibitgroup promoted Houghton several times, from Senior Designer to Creative Director of the Chicago division and eventually to Senior Vice President of Design and Creative, a role that she performed for the last three years of her employment with Exhibitgroup. In that role, Houghton supervised the company's team of creative directors and designers and, among other things, had budget responsibilities. Her job duties included "[d]irect involvement in the review and development of design solutions for major project initiative." During her deposition, she clarified that rather than developing design solutions, she relied primarily on her creative directors to develop the solutions, which she then reviewed. Houghton also was involved in client "pitches," was privy to information regarding Exhibitgroup's strategic plan, and knew Exhibitgroup's costs for providing services and projects. Houghton worked primarily in providing design services for "Exhibit Services," as opposed to working in "Exposition Management."

Exhibitgroup paid Houghton a base salary of $175,000. In addition to her base salary, as a senior executive Houghton was eligible to participate in Viad's voluntary Management Incentive Plan (the "Plan"). The 2007 Plan's stated purpose was to provide key executives with an incentive to achieve goals set forth under the Plan. The company-wide performance goals were tied to overall company performance and included targets for pre-tax income, value added measurement, cash flow, revenue, and other performance measures. The terms stated that bonuses paid under the Plan shall be deemed "special compensation."[1] Paragraph V9A0 of the 2007 Plan provided, in pertinent part:

---

[1] William Doolittle, Exhibitgroup's Executive Vice President and Chief Sales Officers, testified that he believed that Viad incentive plans generally prohibit participants from working for a competitor in any

2

> In order to better protect the goodwill of Viad and its Affiliates * * * and to prevent the disclosure of Viad's or its Affiliates' trade secrets and confidential information * * * , each participant in this Plan, without prior written consent of Viad, will not engage in any activity or provide any services, whether as a director, manager, supervisor, employee * * *, for a period of two (2) years following the date of such participant's termination of employment with Viad or any of its Affiliates, in connection with the manufacture, development, advertising, promotion, design, or sale of any service or products which is the same as or similar to or competitive with any services or products of Viad or its Affiliates * * *:
>
> (a) with respect to which such participant's work has been directly concerned at any time during the two (2) years preceding termination of employment with Viad or one of its Affiliates, or
>
> (b) with respect to which during that period of time such participant, as a consequence of participant's job performance and duties, acquired knowledge of trade secrets or other confidential information of Viad or its Affiliates.[2]

The 2007 Plan also required the repayment of payments made under the Plan in the following circumstances:

> If, at any time within two (2) years following the date of a participant's termination of employment with Viad or any of its Affiliates, such participant engages in any conduct agreed to be avoided in accordance with paragraph V A, then all bonuses paid under this Plan to such participant during the last 12 months of employment shall be returned or otherwise repaid by such participant to Viad.

After reviewing the terms of the 2007 plan, Houghton elected to participate in the plan. In March 2008, Houghton received a payout of $102,000 under the 2007 Plan.

---

capacity after leaving Exhibitgroup. While Defendant stresses Doolittle's personal interpretation of Viad's incentive plans, it is the language of the Plan itself, not Doolittle's understanding of the Plan, that controls.

[2] Both parties agree that Houghton did not acquire knowledge of trade secrets as that term is used in this paragraph of the Plan. However, Houghton did acquire the following "confidential information": identity of clients, Exhibitgroup's strategic plan, marketing plans, planned pitches, knowledge of client needs and desires, and financial information related to Exhibitgroup's design budget. Both parties agree, for purposes of summary judgment, that Plaintiff has no evidence that Defendant has used or attempted to use confidential information as that term is used in this paragraph of the Plan.

3

Houghton resigned from Viad effective September 26, 2008, and began working for The Freeman Companies ("Freeman") on October 1, 2008. Exhibitgroup and Freeman compete in the exhibit and events design industry. Like Viad, Freeman divides its business into segments, including Exposition Management Services and Exhibit Services. Houghton testified that Exhibitgroup and Freeman are competitors, that they both sell design services to their clients, and that her current job with Freeman, as with her job at Exhibitgroup, involved the sale of design services to clients:

> Q: Are the Freeman Companies and Exhibitgroup competitors?
> A: Yes.
> Q: Do they sell the same services to their clients?
> A: Yes.
> Q: And as that relates to you, they both sell design services to their clients?
> A: Yes.
> Q: And that sort of design services is what your work was concerned with while you were employed by Exhibitgroup?
> A: Yes.
> Q: During the entirety of your tenure with Exhibitgroup?
> A: Yes.
> Q: And your current job is also involved in the sale of design services with the Freeman Companies?
> A: For one particular client, yes.

Houghton Dep. at 45:13-46:10. Houghton testified that at Freeman, she guides a team of designers – by managing the client's expectations and making sure the designers are delivering – and also manages a budget for her client's project.[3] Houghton asserts that the services she

---

[3] During her deposition, Houghton refused to provide information regarding the identity of her one client at Freeman and the nature of the services that she is performing for this client. She testified only that she is providing design services related to an exposition. In a subsequent affidavit, Houghton set forth additional information regarding her service to the Freeman client. Because Houghton refused to provide that information during her deposition, to the extent that the statements in her affidavit contradict her deposition testimony or provide information that she was unwilling to provide previously (when Plaintiff's counsel would have been able to question her regarding this information), the Court will not consider the affidavit in ruling on the summary judgment motions. It is unfair for a party to claim a lack of general knowledge about a subject in a deposition and later make a statement that requires detailed knowledge about the same subject. See *Unterreiner v. Volkswagen of America, Inc.*, 8 F.3d 1206, 1210 (7th Cir. 1993). Likewise, it also is unfair for Defendant to claim during her deposition that information sought is confidential and then later selectively disclose information on that subject that is favorable to

4

provides to Freeman are different because Houghton is providing design services related to one exhibition for one client, rather than individual exhibits and/or events for multiple clients.

Effective September 26, 2008, Houghton forfeited previously-awarded stock options, restricted stock, and performance units under the terms of the plans pursuant to which those were issued. Those plans are separate from the 2007 Plan at issue in this lawsuit. On October 3, 2008, Viad demanded repayment of the $102,000 payout made to Houghton under the 2007 Plan. Houghton refused to repay the Plan payout.[4]

## II.  Discussion

### A.  Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette, Ind.,* 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the

---

her, without subjecting herself to examination by opposing counsel. See *Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719, 720 (7th Cir. 1998). That is precisely the type of gamesmanship that the rule against sham affidavits forbids.

[4]  Houghton also has a post-termination agreement with Exhibitgroup related to customer non-solicitation provisions and agreements not to disclose Exhibitgroup trade secret and confidential information. Those agreements are not the subject of this lawsuit.

nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252.

**B.    Breach of Contract**

*1.    Houghton's roles with Exhibitgroup and Freeman*

Under the terms of the Plan, if Houghton went to work for a competitor and provided services to the competitor that were "directly concerned" with the services that she performed during her last two years of employment or about which she had confidential information, she was required to return the payout. The parties do not dispute that Exhibitgroup and Freeman compete in the exhibit and events design industry and that both sell design services to their clients. Houghton asserts that the services that she provides to Freeman are different because she provides design services related to one *exhibition* for one client, rather than providing design services related to individual *exhibits* and events for multiple clients, as she did with Exhibitgroup.[5]

---

[5] According to a standard dictionary, an exhibit is defined as (i) an object or collection of objects on public display in an art gallery or museum or at a trade fair," or (ii) "an exhibition." *The New Oxford American Dictionary* 591 (2d ed. 2005) (def. 1 and 2). An exhibition is defined as (i) "a public display of works of art or other items of interest, held in an art gallery or museum or at a trade fair." *Id.* at 591 (def.

While Houghton may not have the exact same role with Freeman that she performed with Exhibitgroup, Houghton testified that her current job with Freeman, as with her job at Exhibitgroup, involved the sale of design services to clients. See Houghton Dep. at 45:13-46:10. Whether she works on one exhibition or several exhibits, she specifically testified that the design services she provides at Freeman are what her work "was concerned with" at Exhibitgroup. *Id*. In both instances, she was in a supervisory role providing design services to clients in the exposition industry. As Senior Vice President Design and Creative at Exhibitgroup, her job duties included "[d]irect involvement in the review and development of design solutions for major project initiative." Even though she took issue with the notion that she was "developing" the design solutions, she admitted to reviewing the design solutions that her creative directors proposed. As Vice President of Creative Accounts at Freeman, she testified that she has more of a focus on design and creative – on "doing more design." In both instances, however, she is responsible, at least to some extent, for developing and implementing design services for her clients. Thus, the services that Houghton now provides to Freeman are "directly concerned" with what she did at Exhibitgroup, and she violated the Plan's competitive activities provision.

### 2. *Reasonableness of the Plan's restriction*

Having found that Houghton violated the Plan's competitive activities provision, the Court also must determine whether Illinois courts would enforce the repayment provision. Generally, Illinois disfavors non-compete provisions in employee contracts. See *Advent Elecs., Inc. v. Buckman*, 112 F.3d 267, 274 (7th Cir. 1997). Typically, cases involving restraint of trade arise in the context of a contract that completely prohibits the employee from engaging in competition with his former employer within a designated area for a specified period of time.

---

1). Defendant's attempt to parse the terms "exhibit" and "exhibition" only highlights the similarity between the two.

See *Johnson v. County Life Ins. Co*., 300 N.E.2d 11, 13 (Ill. App. Ct. 4th Dist. 1973). A party seeking to enforce a competition restriction to preclude an employee from engaging in competitive activities must demonstrate the reasonableness of the restriction. However, in this case, Viad does not seek to enforce the forfeiture clause as an outright prohibition on competition. While Houghton remained free to take whatever employment she chose, the restriction required her to forfeit her bonus if she went to work for a competitor in a similar capacity.

Federal courts, including the Seventh Circuit, draw a distinction between provisions that prevent an employee from working for a competitor and those that call for a forfeiture of certain benefits should she do so. *E.g.*, *Tatom v. Ameritech Corp*., 305 F.3d 737, 744 (7th Cir. 2002); *Sarnoff v. American Home Prods. Corp*., 798 F.2d 1075, 1080-81 (7th Cir. 1986); see also *Clark v. Lauren Young Tire Ctr. Profit Sharing Trust*, 816 F.2d 480, 482 n. 1 (9th Cir. 1987) ("a non-competition forfeiture clause in a pension plan is not like a non-competition agreement in the employment contract, which may unreasonably restrain trade or endanger the employee's livelihood"). As the Seventh Circuit has observed on two separate occasions, the Illinois Supreme Court has yet to determine the enforceability of a forfeiture provision related to a bonus payment. See *Tatom*, 305 F.3d at 745; *Sarnoff*, 798 F.2d at 1080-81. Although Illinois law remains unclear on forfeiture provisions such as the one at issue in this case, "the majority view in this country seems to be that a forfeiture for competition clause in an employment agreement is enforceable without regard to the reasonableness of the restraint on the former employee." *Cheney v. Automatic Sprinker Corp.*, 385 N.E.2d 961, 964 (Mass. 1979); see also *Schlumberger Technology Corp. v. Blaker*, 859 F.2d 512, 516 (7th Cir. 1988) (noting that the "majority of

states enforce * * * forfeiture clauses" calling for the forfeiture of benefits such as "severance pay, stock options, bonuses, pensions, and the like" in the event of competition).

In *Tatom*, the Seventh Circuit ultimately held that the forfeiture of a stock option for violating a competition provision was enforceable as a matter of law. See *Tatom*, 305 F.3d at 744-46 ("A provision that calls for the forfeiture of a bonus in the form of stock options does not strike us an unreasonable restraint on competition"). Although the court recognized the difference between forfeiture of wages or commissions – which might be deemed to impact the employee's livelihood – and forfeiture of bonuses not provided as compensation for services performed, the court still applied a reasonableness test to the forfeiture provision. The court acknowledged that "Illinois courts might distinguish between the forfeiture of a 'bonus' like a stock option and 'regular compensation' like wages and commissions," but concluded that it need not decide how such a forfeiture provision would be treated under Illinois law because the anti-competitive clause at issue was reasonable: "A provision that calls for the forfeiture of a bonus in the form of stock options does not strike us as an unreasonable restraint on competition." *Id*. at 745. The court determined that the provision was reasonable because it protected the legitimate business interest of aligning the employee's interests with those of the company. *Id*. Notably, although it assessed the overall reasonableness of the covenant at issue, the *Tatom* court did not address the geographic or temporal scope of the restriction.

Applying a similar "reasonableness" test to the restrictive provision at issue here, the Court finds the clause at issue – whether deemed to be an "anti-competitive clause" or a "forfeiture provision" – to be reasonable. *Id*.; *cf.*, *Advent Electronics, Inc. v. Buckman*, 112 F.3d 267, 274 (7th Cir. 1997) (internal citations omitted); *Baird and Warner Residential Sales, Inc. v. Mazzone*, 893 N.E.2d 1010, 1014 (Ill. App. Ct. 2008) (factors to consider include the hardship

caused to the employee, the effect upon the general public, the geographic and temporal scope of the restrictions, as well as the activities restricted). Participation in the Plan was voluntary – that is, it was not a condition of initial or continued employment with Exhibitgroup. Instead, it was offered to select employees serving in executive roles, who possessed key information about the business and made strategic decisions effecting the company's performance. The Plan specified that payouts were not tied to individual performance; rather, the bonuses were based on company-wide performance goals, including targets for pre-tax income, value added measurement, cash flow, revenue, and other performance measures.[6] If the company did well, its executives – who undoubtedly contributed to the company's success – would be rewarded. Unlike an individual performance goal, these goals were tied to the company as a whole; viewed another way, the Plan rewarded key members of a team for its collective performance, rather than compensating an MVP for her personal accomplishments.

Like the restriction in *Tatom*, the forfeiture provision in the Plan did not seek the reimbursement of "wages." None of Houghton's $175,000 salary was tied to her participation in the Plan. *Cf. Johnson v. County Life Ins. Co.*, 300 N.E.2d 11, 14-15 (Ill. App. Ct. 4th Dist. 1973) (treating employment agreement like a covenant not to compete, whereby the employee, a life insurance agent, would forfeit certain commissions, which were part of his regular compensation, if he quit and went into competition with his former employer). Indeed, Houghton refers to the payout as a "bonus." See generally Def. Mem. In response to Viad's insistence that that the bonus was more like a stock option than a wage, Houghton points to dicta in *Tatom* that distinguishes between stocks options and bonuses: "Stock options, in contrast to

---

[6] In her affidavit, filed after her deposition, Houghton asserts that the Plan rewarded executives for their individual efforts. Contrary to Houghton's unsupported assertions, the language of the Plan supports the inference that payments are not tied to individual performance; rather, the bonuses are predicated on company-wide performance goals.

10

other types of regular and bonus compensation, give an employee the right to acquire an ownership interest in a company; that interest in turn gives the employee a long-term stake in the company and supplies him an incentive to contribute to the company's performance." 305 F.3d at 745. However, because Houghton already received a healthy salary from Exhibitgroup and her bonus was based on company, not individual, performance, the rationale underlying this dicta supports Exhibitgroup's, rather than Houghton's, position. The "bonus" was not "regular compensation" (*Id.*); to the contrary, it was awarded as part of a voluntary program and came with a string explicitly attached – namely, repayment to the company in the event that Houghton went to work for a competitor. Undoubtedly, Exhibitgroup wanted to provide its key employees with an incentive to stay put and to reward employees for loyalty. Houghton accepted this special compensation, in addition to her $175,000 salary, knowing that she would be required to return it if she violated the competition provision. The bonus was not the ordinary fruits of her every day labor; rather, it was "special" compensation predicated on more than Houghton's day-to-day job responsibilities.

An agreement provision under which an employee who joins a competitor forfeits a bonus does not have the makings of a traditional, disfavored covenant not to compete, because it does not prevent post-termination employment, but only discourages it by working a forfeiture of an economic advantage. This forfeiture contract leaves Houghton free to make a living as she chooses. She accepts the money and refrains from competition or she negotiates a salary and bonuses with the competitor to exceed the loss that she takes in abiding by the forfeiture clause. Such a choice does not appear to threaten loss of livelihood. See, *e.g.*, *Schlumberger Technology Corp. v. Blaker*, 859 F.2d 512, 516 (7th Cir. 1988). The Court assumes that Illinois would not enforce the agreement if there were a danger that Houghton would be made a pauper and become

11

a dependant of the Illinois Department of Welfare because she must choose between competing with Exhibitgroup and losing her incentive award. But any such danger is not present on these facts. Nor is this a situation in which a company seeks to recoup a bonus paid to an employee whom it fired without cause; again, Illinois may be disinclined to enforce that kind of agreement.

A forfeiture clause does not deprive the public of the benefits of competition when, as in this case, Houghton was able to go into competition despite the clause, and the effect of the clause did not impoverish Houghton, who likely took Freeman's offer only because it compensated for the benefits she had to forfeit upon leaving Viad. "An offer like the one made to [Houghton] – sometimes called 'golden handcuffs' – is not a plausible way to monopolize an industry." See *Schlumberger*, 859 F.2d at 517. The restrictive clause in the Plan did not prevent Houghton from working in her field; instead, it exacted a certain cost on her – of which she had advance notice in agreeing to participate in a voluntary incentive program – for exercising her right to compete. See *Spitz v. Berlin Industries, Inc.*, 1994 WL 194051, at *3 (N.D. Ill. May 13, 1994). Thus, because the clause at issue does not appear to be an unreasonable restraint on competition, the Court concludes that the Illinois courts would have enforced the terms of the Plan had this suit been filed in state court.

## III. Conclusion

For the reasons stated above, the Court grants Plaintiff Viad's motion for summary judgment [26] and denies Defendant Houghton's motion [38].[7]

Dated: February 26, 2010

Robert M. Dow, Jr.
United States District Judge

---

[7] In its memorandum in support of its motion for summary judgment, Viad claims that pursuant to 815 ILCS 205/4, it is entitled to prejudgment interest at the rate of 9% from October 3, 2008, to the date of this order. In her briefs, Houghton did not address Viad's contention concerning interest. The relevant portion of § 205/4 states that "in all written contracts it shall be lawful for the parties to stipulate or agree that 9% per annum, or any less sum of interest, shall be taken and paid upon every $100 of money loaned or in any manner due and owning from any person to any other person or corporation in this state * * *." A simple reading § 205/4 reveals that the 9% rate specified there deals only with what may be a permissible rate when stipulated or agreed to in written contracts. See, *e.g.*, *National City Healthcare Finance v. Refine 360, LLC*, 607 F. Supp. 2d 881, 884 (N.D. Ill. 2009). Viad has not directed the Court to any portion of its agreement with Houghton where the parties stipulated or agreed to any interest rate, much less a rate of 9% interest. Thus, the Court is not in a position to award Viad prejudgment interest pursuant to Section 205/4. Even absent a contractual agreement on interest, it may be the case that Viad is entitled to prejudgment interest. Because an award of prejudgment interest "normally is considered an element of the judgment itself, that is, of the relief on the merits" (*First Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 572 (7th Cir. 2009)), the Court requests additional briefing on Viad's request for prejudgment interest. Viad is given until 3/10/10 to provide a supplemental brief on why it believes it is entitled to prejudgment interest and at what rate; Houghton is given until 3/17/10 to respond to Viad's submission. After considering those additional briefs, the Court will issue a final judgment in this case.